## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JOSHUA ROSA,

      Petitioner,

v.                                  Case No. 8:17-cv-2474-T-35TGW

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## O R D E R

Before the Court is Rosa's petition for the writ of habeas corpus under 28 U.S.C. § 2254 challenging his state court conviction for first-degree murder. After reviewing the petition and supporting memorandum (Docs. 1 and 2), the amended response and appendix (Docs. 13 and 15), and the reply (Doc. 16), it is **ORDERED** that the petition is **DENIED**.

## PROCEDURAL BACKGROUND

A jury found Rosa guilty of first-degree felony murder and the state court sentenced Rosa to life in prison. (Doc. 15, Ex. 1 at 121, 159) The state appellate court affirmed in a written opinion and the state supreme court denied discretionary review. *Rosa v. State*, 97 So. 3d 824 (Fla. 2012); *Rosa v. State*, 58 So. 3d 900 (Fla. 2d DCA 2011). The post-conviction court denied relief after an evidentiary hearing (Doc. 15, Ex. 10 at 112–25 and Ex. 13 at 307–13) and the state appellate court affirmed. (Doc. 15, Ex. 17) Rosa's timely federal petition followed.

1

## FACTS[1]

Rosa, a 19 year-old, lived across the street from Stephen Tomlinson, a 13 year-old. On December 8, 2005 in the afternoon, Rosa's mother saw Rosa and Tomlinson outside together. Another witness saw Tomlinson ride his bicycle in the direction of a nearby park and Rosa follow about five minutes later with a big flashlight.

Shortly after, Kevin Whitely and Fabian Flis saw Rosa walk out of a wooded area at the park shining the flashlight. Rosa told Whitely that "a kid back there is possibly dead, possibly hurt," and asked Whitely if he had a mobile telephone. Rosa ran across the street to ask a neighbor for help. Rosa returned to the woods with Whitely. Whitely saw Tomlinson's body lying several feet away from his bicycle.

Blood ran from Tomlinson's nose and mouth and his jeans were pulled down around his ankles. Whitely tried to pick Tomlinson up but was unable to do so and instead checked his vital signs. Rosa held the back of Tomlinson's head while Whitely checked to see if Tomlinson's pupils were dilated. When police arrived, Rosa pulled out a pair of white gloves from his pocket and showed them to Whitely. Rosa had a pair of fingernail clippers in the same pocket.

Rosa had fresh scratches on his armpit, forearm, and bicep and blood on his hands, pants, shoes, and white gloves. DNA from these bloodstains matched Tomlinson's DNA. DNA from the fingernail clippers matched Rosa's DNA and Tomlinson's DNA. DNA from fingernail clippings from Tomlinson's left hand also matched Tomlinson's DNA and a foreign profile. Police further examined the fingernail clippings with YSTR DNA testing — a type of testing that relies on male DNA. An analyst could not exclude Rosa or any of his

---

[1] The factual summary is derived from the briefs on direct appeal and trial transcripts.

male relatives as a contributor to the DNA from the fingernail clippings. A medical examiner observed injuries to Tomlinson's neck and opined that the cause of his death was asphyxia due to strangulation. The injuries were consistent with strangulation by hands. The examiner identified injuries to other parts of Tomlinson's body inflicted before death.

For the defense, Rosa's mother and another witness testified that Rosa regularly used the white gloves at church services. A forensic pathologist testified that Tomlinson's injuries were consistent with strangulation by a forearm and indicated that two or more assailants were involved.

Based on this evidence, the jury found Rosa guilty of felony murder and concluded that he killed Tomlinson while committing or attempting to commit aggravated child abuse. (Doc. 15, Ex. 1 at 121)

## STANDARDS OF REVIEW

**AEDPA**

Because Rosa filed his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act, AEDPA governs his claims. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in

> light of the evidence presented in the State
> court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Clearly established federal law refers to the holding of an opinion by the U.S. Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

 "[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 694 (2002). An unreasonable application is "different from an incorrect one." *Id.* Even clear error is not enough. *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Rosa asserts ineffective assistance of counsel — a difficult claim to sustain.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984) explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel"

> guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

 "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 691. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due,

it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

The state appellate court affirmed in an unexplained decision the post-conviction court's order denying Rosa's ineffective assistance of counsel claims. (Doc. 15, Ex. 17) A federal court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume[s] that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Because the post-conviction court recognized that *Strickland* governed the claims (Doc. 15, Ex. 10 at 114–15), Rosa cannot meet the "contrary to" test in Section 2254(d). Rosa instead must show that the state court either unreasonably applied *Strickland* or unreasonably determined a fact.

**Exhaustion and Procedural Default**

A petitioner must exhaust the remedies available in state court before a federal court can grant relief on habeas. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard v. Connor*, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

A federal court may stay — or dismiss without prejudice — a habeas case to allow a petitioner to return to state court to exhaust a claim. *Rhines v. Weber*, 544 U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982). If the state court would deny the claim on state

procedural grounds, the federal court instead denies the claim as procedurally barred. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

A petitioner may excuse a procedural default on federal habeas by (1) showing cause for the default and actual prejudice from the alleged violation of federal law or (2) demonstrating a miscarriage of justice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *House v. Bell*, 547 U.S. 518, 536–37 (2006).

## DISCUSSION

**Ground One**

Rosa contends that jurors compared notes during trial. (Doc. 1 at 4) Rosa asserts that trial counsel was ineffective for not interviewing the jurors, moving to strike jurors, or moving for a mistrial. (Doc. 1 at 4–5) The post-conviction court denied the claim as follows (Doc. 15, Ex. 13 at 307–08) (state court record citations omitted):

> . . . Defendant alleges ineffective assistance of counsel due to counsel's failure to adequately inquire and move for mistrial following the State's discovery of two jurors comparing notes during trial. Specifically, Defendant alleges that had counsel moved for a mistrial following the discovery, the Court would have determined that a new trial was required.
>
> The Court notes that the following transpired on the record:

> | [Prosecutor]: | May Mr. Gonzalez and I speak with you for a moment? |
> |---|---|
> | The Court: | Yes. |

> (A bench conference was held, as follows:)

> | [Prosecutor]: | We're not suggesting you make an inquiry or suggestion at this time. My assistant, Ms. Blevins, observed two of the jurors on a |
> |---|---|

|  | couple of occasions in trial comparing — actually comparing notes. I don't know that that's appropriate. I don't know that I've had a trial where they've taken notes throughout the whole trial. But for the purpose of note taking, if you could make an inquiry, if you think appropriate, at a time that doesn't follow our bench conference right now because then it looks like even Brian and I are bad guys. |
|---|---|
| The Court: | Just tell me what to say later. |
| [Trial counsel]: | I would suggest to the court if you feel it appropriate that ladies and gentlemen, I just want to let you all know that although you have the ability to take notes, it's inappropriate for [you] to share those notes or discuss and compare those notes. |
| The Court: | I'll wait until after. Okay. |

(The bench conference concluded.)

After three additional witnesses provided testimony during the trial, the Court made the following announcement to the jurors:

| The Court: | All right. Our jury's back in the courtroom and seated. The defendant and all counsel are present. You can all be seated. Again, members of the jury, has anybody been exposed to anything during the break in any way, shape or form? I see no show of hands. |
|---|---|
|  | Just to remind you and caution all of you to please make certain that during recesses or breaks or what have you that the jurors individually not discuss this case |

> with each other and that includes not showing each other your notes and what have you. You can certainly do that when you go back to deliberate, but not until you do that.

> At the evidentiary hearing on his motion, Defendant testified that he did not learn about the potential juror misconduct until after the trial. He alleged that counsel never brought it to his attention. [Trial counsel] testified that Miss Blevins, the prosecutor's assistant, indicated that she had seen a couple jurors showing or tilting their notepads to each other. He testified that he was not aware if what was shown was evidentiary in nature or unrelated to the trial. He testified that based on the description of what happened, it did not appear the jurors were collaborating. [Trial counsel] testified that he had a brief discussion with Defendant regarding what happened, but because he did not feel that it impacted the trial, he did not suggest that anything be done about it. [Trial counsel] testified that not only did he feel it was not worthy of a mistrial, but he also liked the jury that was chosen, and he felt that they were already creating reasonable doubt. [Trial counsel] testified that for these reasons, he did not move for a mistrial. The Court finds [trial counsel's] testimony credible. After considering the testimony presented at the hearing, and the record, the Court finds counsel's decision not to move for a mistrial was reasonable trial strategy. Further, the Court finds Defendant has failed to demonstrate that a motion for mistrial would have been granted. As such, [the claim] is denied.

The state court found trial counsel credible at the post-conviction evidentiary hearing, and a state court's credibility determination receives deference in federal court. *Nejad v. Att'y Gen., State of Ga.*, 830 F.3d 1280, 1292 (11th Cir. 2016) ("'Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review.'") (citation omitted).

At the hearing, trial counsel testified as follows (Doc. 15, Ex. 13 at 243–46):

> [Prosecutor:]   . . . I would like to address with you first the claim concerning failure or alleged ineffectiveness concerning purported jury

misconduct involving jurors who had been seen comparing notes in the jury box during trial. What do you recall about that scenario, sir?

[Trial counsel:]   You know, we took great pains in selecting our jury. I cannot remember whether this was the first or second day of trial because it was multiple — I think it was a week, almost, of testimony.

And it was brought to, I believe, your attention by your assistant, Miss Blevins, that she had seen a couple of the jurors during the course of testimony, not outside of the presence of the courtroom, either showing or tilting their notes to each other.

And I believe, as I recall, you approached the bench. We approached. You told the court in an abundance of caution, Judge, Miss Blevins saw a couple of jurors maybe sharing or looking at notes during the course of the proceedings. I believe she said it happened on two occasions. It did not appear based on what you were telling the court that it was something that was habitual or something that was for a significant length of time or something that would have insinuated that jurors were collaborating.

So we decided that we would not at that particular moment of approaching making the jury aware of what the circumstance was, but that we would do it in due course during the course of the day in between witnesses, and with regard to their general admonishments of what they should be doing outside and inside of the courtroom.

I went back. I had a very brief, and it was very brief, conversation with [Rosa] just to say, look, there might have been a couple jurors comparing notes. But to be very

honest, I did not consider it worthy of making an issue of. I did not see it to be something that impacted the course of the trial. I did not suggest to [Rosa] that anything should be done about it.

He briefly looked at me and said, fine, and that was it. We moved on. The court did, in fact, three or four witnesses later comment to the jury, look, you understand when you leave today, you're not to talk about it, and of course, you're taking notes, make sure that you don't share those notes with each other and talk about your notes amongst each other.

As the court knows, as you know, those tablets are left on the seats during breaks. They're left overnight. They're not allowed to be taken home with the jurors.

So there was — I loved my jury. I — not only did I like my jury, I also felt like [at] that point in time, we were getting what we wanted in. We were in a position to already, in my estimation, be creating some reasonable doubt. So the possibility of mistrial really never even entered my mind.

[Prosecutor:]    And in summary, you did not move for a mistrial as a strategic decision?

[Trial counsel:]    One hundred percent. Not only did I believe that it was not worthy of [a] mistrial, certainly you do things sometimes if you feel the need to even if you don't think they're not worthy, allow the judge to make a determination, but in my particular circumstance, we were ready. We were prepared. I liked my jury. I liked the way things were going, and I saw no need to seek a mistrial for something that I probably would suggest would not have created a mistrial to begin with.

Trial counsel considered what the prosecutor's assistant had observed, how the trial had progressed, and whom the parties had selected as jurors before deliberately not moving for a mistrial. The state court neither unreasonably determined that trial counsel made a strategic decision nor unreasonably applied *Strickland*. *Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."); *Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020) ("'The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct.'") (citation omitted).

Also, Rosa did not identify which jurors shared notes and what the jurors shared in those notes. He did not show that a motion for mistrial would have succeeded or that the outcome at trial would have changed if the trial court had struck the jurors. Consequently, his claim of prejudice was speculative and conclusory. *Strickland*, 466 U.S. at 693 ("[A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice."); *Johnson v. Alabama*, 256 F.3d 1156, 1183 (11th Cir. 2001) (rejecting a *Strickland* claim based on "pure speculation"). *Accord Williams v. State*, 297 So. 3d 660, 662 (Fla. 1st DCA 2020) ("A trial court should only grant a motion for mistrial when an error is deemed so prejudicial that it vitiates the entire trial and deprives the defendant of a fair trial."). Ground One is denied.

**Ground Two**

Rosa contends that the prosecutor commented on his failure to testify three times during closing argument. (Doc. 1 at 7–9) Rosa asserts that trial counsel was ineffective for not objecting and moving for a mistrial. (Doc. 1 at 7–9) The post-conviction court denied

the claim as follows (Doc. 15, Ex. 10 at 117–20) (state court record citations omitted) (bolding in original omitted):

> . . . Defendant alleges ineffective assistance of counsel due to counsel's failure to object and move for a mistrial following comments in the State's closing argument which touched upon Defendant's Fifth Amendment right to remain silent. Specifically, Defendant argues that the State's instruction for the jury to "look for any witness, anything in the record that tells you [Defendant] was out jogging that night" was an impermissible comment on his right to remain silent. Further, Defendant points out that the State argued both "there is no evidence in the record that [Defendant] jogged in the park that night" and "there was only evidence that [Defendant] was at the park one time that night, not jogging." Defendant alleges that those three comments were all improper comments that should have been objected to by his counsel.
>
> After reviewing the allegations, the court file, and the record, the Court finds that Defendant failed to allege prejudice. Normally, the Court would dismiss [the claim] without prejudice to allow Defendant to re-file a facially sufficient claim. However, because the Court finds Defendant's allegations in [the claim] are conclusively refuted by the record, it is not necessary that the Court dismiss [the claim] for such a deficiency.
>
> The record reflects Defendant's counsel made the following arguments during his closing:
>
> [Trial counsel]:  When he does arrive at the park — and remember, he's last. So some of what goes on there is not contemplated in his testimony. He again talks about yelling and — and [Defendant's] fright. He tells you and gives you another piece to the puzzle when he talks about during the yelling and the asking how did you find him, [Defendant] tells them he had been jogging. And so, therefore, consider the consistency of the fact that the testimony [is] that he jogs regularly.

Defendant's counsel went on to argue:

> [Trial counsel:]    Ladies and gentleman, the wrong man is on trial this week. I said it in opening statement. I said it during the trial. I'm saying it now. [Defendant] did not asphyxiate Stephen Tomlinson. He was jogging, lost his keys. He found Stephen Tomlinson. As he did so, he did the best he could.

Following the completion of Defendant's closing argument, the State responds with the following:

> [Prosecutor:]    The defense wants you to believe that he just — that [Defendant] just found Stephen Tomlinson and that he was just an innocent victim of circumstance. And counsel argues to you that [Defendant] was out jogging and lost his keys. Scour your notes when you get back there.
>
> Look for any witness, anything in the record that tells you he was out jogging that night. You will not find that. There is no evidence that he was jogging that night. There's only evidence that he was in that — there's evidence that he was only in that park one time and that he only walked down Mondragon Street to Monterey one time and that he did so with his flashlight and those gloves and that clipper in his pocket.
>
> Ask yourself was he jogging with his flashlight. An innocent victim doesn't look for help in the trees. There is no plausible explanation for why he was there[.]

14

. . .

He didn't expect a car to be back there. His — he was absolutely flushed out of those woods by the presence because he was freaked out that what he had just done was going to be found by people sooner than he thought. And at the first opportunity to reveal the truth, he lied.

Now there is no evidence in the record that he jogged in the park that night. No innocent explanation of that supported.

. . .

The attack was long enough for Stephen to bleed on his own pants and on [Defendant's] pants and shoes. There was only evidence that [Defendant] was at the park one time that night, not jogging. There's no evidence of that. That he was in the park after he left and was seen by Pedro Rivera walking down the street five or ten minutes after Stephen Tomlinson, twenty to thirty minutes before the sirens announced to the world that Stephen Tomlinson was in dire straights.

Defendant is correct in his assertion that because he has the constitutional right to decline to testify against himself, "any comment on, or which is fairly susceptible of being interpreted as referring to, a defendant's failure to testify is error and is strongly discouraged." *Caballero v. State*, 851 So. 2d 655, 660 (Fla. 2003) (citing *Rodriguez v. State*, 753 So. 2d 29, 37 (Fla. 2000)). When determining whether a statement "impermissibly comments on the defendant's right to remain silent during trial, the court should examine the statement in the context it was made." *State v. Jones*, 867 So. 2d 398, 400 (Fla. 2004). However, "it is permissible for the State to emphasize uncontradicted

evidence for the narrow purpose of rebutting a defense argument since the defense has invited the response.["] *Caballero*, 851 So. 2d at 660.

A careful review of the record reveals that the State emphasized the lack of evidence about Defendant jogging on the day of the crime for the purpose of countering the Defendant's argument that he was jogging when he lost his keys and found the victim in this case. By making that argument, Defendant "invited the State's response." *Id.* at 660. The Court finds the State's comment was an invited response to defense counsel's argument that Defendant found the victim while jogging. Therefore, the Court finds Defendant cannot prove defense counsel acted deficiently in failing to make the alleged objection or motion for mistrial when such was an invited response to the defense's argument.

The Court finds that defense counsel "cannot be found ineffective for failing to pursue a 'course of action that counsel would — or should — have known was futile." *Claps v. State*, 971 So. 2d 131, 134 (Fla. 2d DCA 2007); *see Maxwell v. Wainwright*, 490 So. 2d 927, 932 (Fla. 1986) (finding that "we cannot find ineffectiveness based on lack of objection or argument when counsel could reasonably have decided that such objection or argument would have been futile in view of the established rules of law"); *see also Willacy v. State*, 967 So. 2d 131, 140 (Fla. 2007) (explaining that "counsel is not ineffective for failing to make a futile objection["]). Consequently, no relief is warranted on [the claim].

Whether the prosecutor's comments were "fairly susceptible of being interpreted as [ ] comment[s] on silence" is an issue of state law, and a state court's determination of state law receives deference in federal court. *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986) ("In Florida, we have adopted a very liberal rule for determining whether a comment constitutes a comment on silence: any comment which is 'fairly susceptible' of being interpreted as a comment on silence will be treated as such."). *Accord Ford v. Norris*, 364 F.3d 916, 918 (8th Cir. 2004) ("In Mr. Ford's case, the Arkansas Supreme Court came to the conclusion that had Mr. Ford's attorney objected to the prosecutor's statements, the

objection, as a matter of Arkansas law, would probably have been overruled. . . . [T]he Arkansas Supreme Court was applying Arkansas law to the facts of Mr. Ford's case.").

The state court accurately quoted the comments by both the prosecutor and trial counsel during closing argument. (Doc. 15, Ex. 1, Trial Transcript at 1098–99, 1134, 1140–43, 1167) The prosecutor made the disputed comments during rebuttal argument in direct response to the defense's theory that Rosa was jogging before the murder. *Brown v. State*, 771 So. 2d 603, 605–06 (Fla. 4th DCA 2000) ("A narrow exception to the rule forbidding a comment on a defendant's failure to testify applies where the prosecution's statement is invited by the defense."); *Burford v. State*, 8 So. 3d 478, 481 (Fla. 4th DCA 2009) ("Considered in context, the prosecutor was simply responding to the defense's alternative theory that the driver of the pickup truck — and not Burford — had run the red light.  The prosecutor argued that his theory was supported by the evidence and that Burford's theory was not.").

Because neither an objection to the disputed comments nor a motion for a mistrial would have succeeded, the state court did not unreasonably apply *Strickland*. *Meders v. Warden, Ga. Diag. Prison*, 911 F.3d 1335, 1354 (11th Cir. 2019) ("It is not ineffective assistance of counsel to fail to make an objection that is not due to be sustained.").

Rosa asserts that the state court unreasonably determined that no evidence proved that Rosa was jogging. (Doc. 16 at 5–10) Rosa contends that Flis testified that Rosa was jogging. (Doc. 16 at 5) The state court did not make that determination. The state court accurately quoted the parties' comments during closing argument and concluded that the prosecutor did not comment on Rosa's right to not testify.

Even so, Flis did not testify that he observed Rosa jogging. On cross-examination, Flis testified that he heard Whitely and other people threaten Rosa when they discovered Tomlinson's body. (Doc. 15, Ex. 1, Trial Transcript at 687–88) Flis remembered that Rosa explained how he found Tomlinson's body but did not remember what Rosa said. (*Id.* at 688) After he refreshed his recollection with his statement to police, Flis testified that Rosa claimed that he was jogging. (*Id.* at 688–89) The prosecutor objected to the testimony as hearsay, and the trial court overruled the objection. (*Id.* at 689) Because Flis only restated what Rosa claimed that he was doing when he discovered Tomlinson's body and Rosa's out-of-court statement was admitted only to give context to the threats against him, no evidence proved that Rosa was jogging. *Pitts v. State*, 227 So. 3d 674, 678 (Fla. 1st DCA 2017) ("If a statement is offered to show the effect on the listener rather than the truth of the statement, as was the case in this instance, it is not hearsay. Pitts's response to an allegation that he killed someone is relevant, so there was no error in admitting the testimony.") (citations omitted). Ground Two is denied.

**Ground Three**

Rosa asserts that trial counsel was ineffective for advising him not to testify. (Doc. 1 at 10–11) The post-conviction court denied the claim as follows (Doc. 15, Ex. 13 at 309–11):

> . . . Defendant alleges counsel was ineffective when he advised Defendant not to testify in his own defense. Specifically, Defendant argues that counsel advised against him testifying because the State would introduce a three-hour interview that Defendant participated in with the Hillsborough County Sheriff's Office. However, the State did not submit the recording into evidence. Further, Defendant alleges that had he testified, the jury would have heard his version of events and would have found him to be innocent of the crime charged.

18

At the hearing on the motion, Defendant testified that at the end of the State's case-in-chief, he realized his recorded statements had not been admitted into evidence. Defendant testified that he expressed to counsel his concerns regarding not testifying. Defendant testified that counsel advised Defendant that he would support him regardless of whether he chose to testify, and that it was his decision to make; however, counsel advised him not to testify because the prosecutor would "crucify" him. Defendant further testified that counsel advised him that there was no reason to testify because he had already explained the purpose of the gloves and the fact that Defendant was out jogging when he found the victim. Defendant testified that he felt pressured not to testify based on counsel's statement that he would be crucified, by the fact that he was not prepared to testify, by counsel's assertion that he did not want the jury to be able to go home for the weekend, and by the cameras in the courtroom. Defendant testified that he understood that it was his constitutional right to testify or not to testify, and counsel advised him that it was his right alone. Additionally, Defendant acknowledged that he had the [right] to determine whether he would stay with the decision not to testify or change his mind, and that counsel did not pressure him one way or the other.

[Trial counsel] testified at the evidentiary hearing that he met with Defendant several times and provided Defendant with all of the discovery. He testified that after the State rested, he had a conversation with Defendant regarding whether or not he would testify. [Trial counsel] testified that he believed they had created some significant reasonable doubt, and he suggested to the Defendant that he not testify. [Trial counsel] testified that he did not believe it would be in Defendant's best interest to testify because Defendant had an odd demeanor. [Trial counsel] testified that Defendant was not a very emotional young man, and he appeared to be very calculated in his responses. He testified that although Defendant had many good qualities, he was able to get many of those critical items admitted through other witnesses. [Trial counsel] testified that after considering the fact that he would be subjected to cross-examination by a very skilled prosecutor, understanding the inconsistencies with the Defendant's story, and feeling like they had created significant reasonable doubt, he suggested to Defendant that he not testify. [Trial counsel] testified that he did not pressure Defendant not to take the stand. Finally, [trial counsel] testified that he prepared the Defendant to testify by conducting a mock direct examination and by discussing what questions he might face on cross-examination. [Trial counsel]

testified that the Defendant never expressed any second thoughts about not testifying. After considering the testimony presented at the evidentiary hearing, and the record, the Court finds that counsel's decision to advise the Defendant not to testify in his own defense was reasonable trial strategy. Therefore, the Defendant is not entitled to relief on [the claim].

At the post-conviction evidentiary hearing, trial counsel testified as follows (Doc. 15, Ex. 13 at 246–62):

> [Prosecutor:]  And the state ultimately having rested without playing a taped interview of the defendant conducted by the investigators, did you have discussions after the state rested with Mr. Rosa about him testifying?
>
> [Trial counsel:]  Let me go back a little bit, too. We prepared, to the extent that there might be testimony, we talked about Mr. Rosa's story. I was certainly prepared in the event that we were to determine that it was in his best interest to take the stand, to do a direct examination.
>
> After the state rested, we had a conversation. I believed that we had created some significant reasonable doubt. I anticipated still my case where I had not even put on my expert yet. I hadn't put on my witnesses on Mr. Rosa's behalf and certainly I knew what they would be saying, and I suggested to [Rosa] that he not testify.
>
> [Prosecutor:]  Okay. And how did he respond, if you recall, in general terms?
>
> [Trial counsel:]  He took my advice wholeheartedly. I mean this is not the first conversation that we had. We had conversations previously. This is not the first time that I said, hey, [Rosa], what do you think about testifying? We had those conversations periodically along the way; and, you know, [Rosa] did have a story to tell. . . .

|  | [T]he bottom line was in this particular circumstance, I felt for a number of different reasons that it wouldn't be in his best interest to testify. |
|---|---|
| [Prosecutor:] | Explain what, if any, other reasons that you thought perhaps — as you explained it to him, that it wouldn't be in his best interest to testify? |
| [Trial counsel:] | . . . [Rosa] had an odd demeanor. He was not, at least during that period of time, a very emotional young man. He appeared in my estimation to be very calculated in his responses, even to me, even in discussing the case, even as we developed his version of what occurred. It was strange because even law enforcement during the course of their interview with him made that statement to him over and over and over again. . . . The state on a couple of occasions had made mention to me during the course of our interactions that he appeared to be a little bit of a strange young man. Now, granted there were lots of good things. You know, he had no prior criminal history. He worked. He went to school. He was a leader of a youth ministry, but those are all things that I was going to be able to get out without him. So — |
| [Prosecutor:] | And you did so through the testimony of his girlfriend and others, correct? |
| [Trial counsel:] | Absolutely, his mother, people — a person from the church. Many of the things that I felt were critical in having the jury know about [Rosa] I was able to get admitted. Now, granted, what I wasn't — |
| [Prosecutor:] | Excuse me. In that vein, you were able to personalize him without subjecting him to cross-examination? |

[Trial counsel:]   There is no question about it. His affect was very flat. Even in the post-*Miranda* interview, you know, he would mold himself to the questions of law enforcement as the story evolved. . . . And I felt after weighing the fact that he would be subjected to a very veteran prosecutor, a very skilled prosecutor, understanding the shortcomings of the story and feeling like I had created a significant amount of reasonable doubt, I suggested to him and he did not blink. . . .

. . .

[Prosecutor:]   Was there also a concern — or did you have any concern from the defendant's recorded interview statements about any inconsistencies expressed by Mr. Rosa in that interview as to where he was when he first saw the body of Stephen Tomlinson?

[Trial counsel:]   You know, there were a number of inconsistencies and, you know, depending on your client, you can either feel comfortable he's going to explain them in a manner that the jury will understand and believe or you can be concerned that it will not go well. And part of the reason in not putting or advising [Rosa] that I didn't believe that it was in his best interest to become a witness was those inconsistencies about at what point in time he saw the body and from what distance and under what circumstances, circumstances as it relates to the multiple trips that he took back out to the park and why he would do that, the chronology of events in terms of when he had his cell phone and when he didn't, and when he lost his keys and how he found them and how they ended up underneath the victim's body. . . .

[Prosecutor:]   You've alluded to a few minutes ago steps you had taken to prepare Joshua Rosa in

the event that he did testify. Could you go further explaining what, if any, steps that you did take to prepare him for that?

[Trial counsel:]    I mean we did a direct type of examination, a posture, he and I. I mean, we had talked about his story. Obviously, I knew his story from day one, from the very first day I interviewed him. So there was nothing new to me during the course of the ramping up of discovery and utilizing that story to frame my deposition questions and to be able to elicit what I believed to be evidence I could use at trial keeping in the back of my mind that I just can't presume that Joshua Rosa is going to become a witness. So we talked about what his recollection of events were throughout.

As we got closer, I did not preclude the possibility that he would choose to be a witness, or I would want him to seriously consider being a witness. And it was only at the time that the state rested and I looked at the evidence as it had come out to that point contemplating what was yet to come that I suggested to him that I didn't believe that it was in his best interest to take the stand.

[Prosecutor:]    Did you apply any pressure to him not to take the stand?

[Trial counsel:]    None whatsoever. I never would. It's [Rosa's] life. He was a very young man at the time of this prosecution. You know, I don't do that. I mean it is his life, and I would have been prepared to direct him. We would have, you know, waited for the onslaught as it relates for cross, and we would have done the best we could with it.

. . .

23

> [Prosecutor:]   From the time when the court first engaged in a colloquy with Mr. Rosa concerning his right to testify, at the end of the state's case until the following day when the court engaged in a much briefer colloquy with the defendant, did Joshua Rosa ever express any equivocation or second thoughts about not testifying?
>
> [Trial counsel:]   No, he did not.

Trial counsel considered Rosa's demeanor, his prior inconsistent statements to police, his performance during mock examinations, and the evidence introduced during the prosecution's case-in-chief before advising Rosa not to testify. The state court neither unreasonably determined that trial counsel made a strategic decision nor unreasonably applied *Strickland*. *Strickland*, 466 U.S. at 690. *Accord Maharaj v. Sec'y Dep't Corrs.*, 432 F.3d 1292, 1319 (11th Cir. 2005) ("The tactical decision to advise petitioner against testifying because of the dangerous cross-examination that could ensue was utterly unaffected by the truth or falsity of the [newspaper] articles [about his outstanding warrants] and cannot be a sound basis for a claim of ineffective assistance of counsel."); *Cain v. Sec'y, Fla. Dep't Corrs.*, 266 F. App'x 854, 856 (11th Cir. 2008) ("[B]y Cain's own account, his decision not to testify was part of counsel's overarching advice against presenting a defense case in general, which was also based on counsel's belief the State had not met its burden of proof and the fact that Cain would remain in custody while the defense presented its case. . . . [C]ounsel's advice against presenting a defense case could be considered a reasonable strategy."). Ground Three is denied.[2]

---

[2] Also, at the end of the prosecution's case-in-chief, the trial judge advised Rosa that he had the right to testify or not testify and trial counsel could not make that decision for him. (Doc. 15, Ex. 1, Trial Transcript at 924–27) Rosa confirmed that he understood his rights (*Id.* at 927) and declined to testify. (*Id.* at 1040)

**Ground Four**

Rosa asserts that trial counsel was ineffective for not conducting DNA testing with swabs that police collected from Kevin Whitely and Fabian Flis. ("Failure to Investigate Claim") (Doc. 1 at 12–13) Rosa further asserts that trial counsel was ineffective for not objecting to the admission of the results from the YSTR DNA testing. ("Failure to Object Claim") (Doc. 1 at 13–14)

### Failure to Investigate Claim

Police collected swabs from Whitely and Flis but did not compare DNA on the swabs with DNA collected from the victim's fingernails. (Doc. 1 at 12) DNA on fingernails from the victim's left hand was a mixture of the victim's DNA and DNA from a foreign profile. Rosa asserts that trial counsel was ineffective for neither conducting DNA testing ("Sub-claim A") nor arguing during closing argument that police failed to rule out Whitely and Flis as suspects ("Sub-claim B"). (Doc. 1 at 12)

### Sub-claim A

Rosa asserts that trial counsel was ineffective for not comparing DNA from Whitely and Flis with DNA from the victim's fingernails. (Doc. 1 at 12) The post-conviction court denied the claim as follows (Doc. 15, Ex. 13 at 311–12) (state court record citations omitted):

> . . . Defendant alleges ineffective assistance of counsel for counsel's failure to investigate Kevin Whitely and Fabian Flis, two of the State's witnesses, as potential suspects. Defendant argues that because testimony was presented that placed both Mr. Whitely and Mr. Flis near the scene of the crime, they should have been treated as potential suspects. Specifically, Defendant alleges that investigators took DNA swabs from both of the witnesses, but counsel never had their DNA compared to the DNA that was found under the victim's fingernails. Defendant points out that the State's medical expert

testified that the victim may have died due to the actions of more than one individual. Further, Defendant alleges that because the DNA results could not positively identify Defendant as the sole contributor to the DNA sample, counsel should have had the other DNA samples tested in order to see if the witnesses' DNA contributed to the sample. Defendant argues that had counsel had the additional DNA samples tested, they would not have been excluded as possible contributors to the foreign substance removed from the victim, and thus the jury would have found there was reasonable doubt as to Defendant's guilt.

At the hearing on Defendant's motion, [trial counsel] testified that after taking depositions of all the witnesses he did not find any evidence to indicate that Kevin Whitely, Fabian Flis, or Javier Rivera could be the perpetrators. [Trial counsel] testified that he did not request that the State have the DNA samples tested because he did not want them excluded as possible contributors to the DNA. [Trial counsel] testified that he intended to argue at trial the fact that they were not tested created reasonable doubt. After considering the testimony presented at the evidentiary hearing, and the record, the Court finds that counsel's decision [to] not have Kevin Whitley's or Fabian Flis's DNA compared to the DNA that was found on the victim's fingernails was reasonable trial strategy. Additionally, the Court finds Defendant has failed to meet his burden regarding this claim. Therefore, Defendant is not entitled to relief.

At the post-conviction evidentiary hearing, trial counsel testified as follows (Doc. 15,

Ex. 13 at 259–69):

| | |
|---|---|
| [Prosecutor:] | Did you engage in discovery eliciting their statements during depositions? |
| [Trial counsel:] | I did. I took all of their depositions as it relates to that night, as it relates to their history, as it relates [to] their knowledge of the victim, their knowledge of the defendant; and, so, yes, we were very prepared for their testimony at trial. |
| [Prosecutor:] | And did you investigate the possible avenue of defense of identifying them as the actual perpetrators? |

[Trial counsel:]    So did it cross my mind as a potential defense as it relates to the creation of reasonable doubt, yes. Did I intend on making it an issue for the jury to consider? Yes. Did I find anything as it relates to their relationship with the victim, as it relates to the chronology leading up to the time that their car crossed those poles into the park that would indicate to me having taken the depositions of everyone associated that there was any belief that they could be perpetrators? No, I did not. Their stories were consistent about where they had been previous. They were unimpeachable to that extent in terms of the other people that they were with prior to the incident taking place. The why as to why they were going into the park was, you know, uncontroverted.

. . .

[Prosecutor:]    During your discovery, you learned tha[t] investigators had obtained swabs of DNA voluntarily provided by these witnesses?

[Trial counsel:]    Yes, and there was lots of DNA. There [were] lots of exhibits. There were lots of items analyzed. There were multiple DNA analysts involved from multiple agencies. But, yes, these individuals had been swabbed just in the normal course of police work.

[Prosecutor:]    And had their swabs been tested by the Florida Department of Law Enforcement for comparison purposes to any known DNA sample from either the defendant's gloves or any DNA found on the victim's body?

[Trial counsel:]    They had not.

| | |
|---|---|
| [Prosecutor:] | Had you considered the possibility of requesting that the state be compelled to have the lab test those? |
| [Trial counsel:] | No, I didn't want them tested. |
| [Prosecutor:] | Why is that? |
| [Trial counsel:] | Because I wanted the possibility of having that in my pocket as a form of argument. I didn't want them excluded as it relates to any analysis done. And, you know, the bottom line was [ ] that it was a very small sample. It was a mixture. It was going to be a low yield to begin with, and the bottom line is that although I wasn't going to be able to submit to the jury any other corroborating evidence that would indicate that, you know, they were the perpetrators, you know, it was my intent to say, hey, why didn't they do this? I mean, I think that that is something that I could and wanted to do. |
| [Prosecutor:] | Okay. Well, explain to the court, please, the low profile DNA that you were talking about. This was from underneath the victim's fingernails? |
| [Trial counsel:] | You said it was from underneath the victim's fingernails. It was actually [ ] from the victim's fingernail clippings. No one was able to determine if it was from beneath the fingernails or on top of the fingernails, which to me makes a huge difference, and that was also part of the cross-examination as it relates to the DNA experts . . . . |

Trial counsel deposed Whitely and Flis, investigated whether the two males could have committed the crimes, and confirmed that the two males were not in the park at the time of the murder before deciding to not compare their DNA with DNA found on the victim's fingernails. Trial counsel instead planned to capitalize on the police's failure to

compare the DNA to argue reasonable doubt. The state court neither unreasonably determined that trial counsel made a strategic decision nor unreasonably applied *Strickland*. *Strickland*, 466 U.S. at 690. *Rogers v. Zant*, 13 F.3d 384, 388 (11th Cir. 1994) ("If the act of conducting no investigation of a particular defense is reasonable, the matter is closed; there can be no question about the reasonableness of having failed to present evidence of which the lawyer was unaware as a result of a reasonable decision to investigate no further."); *Palmes v. Wainwright*, 725 F.2d 1511, 1521 (11th Cir. 1984) ("In this circuit 'a strategic decision to pursue less than all plausible lines of defense will rarely, if ever, be deemed ineffective if counsel first adequately investigated the rejected alternatives.'") (citation omitted).

Also, Rosa never demonstrated that DNA from Whitely and Flis matched DNA on the victim's fingernails. Consequently, his claim of prejudice was speculative and conclusory. *Strickland*, 466 U.S. at 693. *Brownlee v. Haley*, 306 F.3d 1043, 1060 (11th Cir. 2002) ("As we have explained, '[s]peculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation.'") (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985)).

**Sub-claim B**

Rosa asserts that trial counsel was ineffective for not arguing during closing argument that the police's failure to compare DNA from Whitely and Flis with DNA from the victim's fingernail supported reasonable doubt. (Doc. 1 at 12) The post-conviction court denied the claim as follows (Doc. 15, Ex. 13 at 311–12) (state court record citations omitted):

> Defendant also alleges . . . that counsel failed to point out during trial that the State had failed to compare the DNA of Kevin Whitely and Fabian Flis with the DNA found on the victim's fingernails, as counsel had advised Defendant he

would do. At the hearing, [trial counsel] testified that he intended to argue this issue during closing, but he did not. [Trial counsel] testified that he did not think it made a difference in the trial. After considering Defendant's motion and the record, the Court finds that based on the evidence presented at trial, there is not a reasonable probability that the outcome of the proceedings would have been different had counsel made this argument. As such, Defendant is not entitled to relief on this claim.

At the post-conviction hearing, trial counsel testified as follows (Doc. 15, Ex. 13 at 259–69):

| [Prosecutor:] | Was it your intent to make an argument to the jury that the state should have — the state's failure to submit the DNA of Mr. Flis and Mr. Whitely to comparison to this fingernail sample was a basis for potential reasonable doubt. |
|---|---|
| [Trial counsel:] | Yes, it was. |
| [Prosecutor:] | Did you do so? |
| [Trial counsel:] | I did not. |
| [Prosecutor:] | Any reason that you can explain? |
| [Trial counsel:] | First of all, did I feel it was a feature of the trial? One hundred percent not. Did I feel like a competent prosecutor would not be able in closing to suggest a number of reasons why it shouldn't be something that should be heavily considered by a jury? Yes, I did. |
| | But in my normal, you know, course of trial of a case, I'm going to try to bring to the jury's attention every possible thing that I can that can create doubt, and it was my intention to say, hey, look, we have a sample here from a couple of individuals. There is evidence potentially that this could have been a crime committed by more than one person. Why didn't they do |

30

that? It would have been something else for the jury to consider.

Now, could I have followed up with, why in particular that would have been critical for them to do? No, I could not, but in the heat of a —

[Prosecutor:]  What do you mean by that?

[Trial counsel:]  Well, you know, in my mind, in the long run, it's not just sufficient to say they didn't do it. It's sufficient to tie in what would have happened had they done it or what other evidence existed that would suggest that those boys were out there and would have had the opportunity to do this, and in my pretrial preparation, which was pretty exhaustive, I couldn't find one scintilla of evidence that would indicate that they would have been out there at that time.

[Prosecutor:]  At the time of the murder?

[Trial counsel:]  Correct. I wouldn't call it alibis because they weren't suspect[s], but the stories matched the people they were around that I deposed that ended up not being witnesses in the trial; but I deposed them, corroborated where they were. . . .

[Prosecutor:]  Was it your view or opinion of the evidence that the state's failure to have the DNA samples of Mr. Flis and [Mr.] Whitely tested by Cellmark and FDLE would have, in your view or estimation, created reasonable doubt?

[Trial counsel:]  I would have loved to have it in my bag of tricks. I would have loved to have been able to argue it briefly along with everything else. It was my intent to do so, but in a two hour and some odd closing argument, I didn't say it. Do I feel, after the trial, do I feel today that had I made

31

> that mention as I intended to do, would it have changed the course of the trial? Unfortunately, because I wanted a positive verdict, unfortunately, no, I don't think that it would have made any significant difference.

The outcome at trial would not have changed. A match between DNA from the fingernail and DNA from Whitely or Flis would not have shown that either committed the murder. The DNA from the fingernail was not from fingernail scrapings; the DNA was from a swab of the top and bottom of fingernail clippings. (Doc. 15, Ex. 1, Trial Transcript at 759) While a match could have shown that the victim scratched Whitely or Flis to defend himself, a match could also have shown that Whitely or Flis may have only touched the top of the fingernail. For example, Whitely testified that he tried to carry Tomlinson's body out of the woods after the murder. (*Id.* at 336) The prosecutor could have explained that a match with DNA from Whitely resulted from this physical contact.

Also, comparing DNA from the fingernail with DNA from Whitely or Flis with DNA testing would not have been conclusive. The DNA analyst testified that the foreign profile in the mixture of the DNA from the fingernail was too weak for STR testing. (Doc. 15, Ex. 1, Trial Transcript at 759–61) The analyst instead used YSTR testing. (*Id.* at 765–66) At most, the analyst could have opined that either Whitely and Flis or their male relatives could not be "excluded" from the DNA sample. (*Id.* at 811–12, 817) The analyst could not have opined that either male was "included" in the sample. (*Id.* at 817) During closing argument, trial counsel argued that YSTR testing was scientifically unreliable. Trial counsel would have contradicted himself by further arguing that the police's failure to use YSTR testing to compare DNA from the fingernail with DNA from Whitely and Flis supported reasonable doubt.

Lastly, trial counsel could not have pointed to any other evidence that tended to prove that Whitely and Flis committed the murder. Trial counsel investigated and did not find any evidence to corroborate the theory. During closing argument, trial counsel pointed to other evidence — or lack of evidence — that supported reasonable doubt. Trial counsel argued: (1) the prosecution failed to prove a motive; (2) Rosa did not flee the scene and instead sought help; (3) Rosa did not have any injuries consistent with the manual strangulation of an individual who was conscious and would have fought for his life; (4) the blood was from Rosa's contact with Tomlinson while rendering aid; (5) testing of the DNA from the fingernail was scientifically unreliable. (Doc. 15, Ex. 1, Trial Transcript at 1088–89, 1103–04, 1109–10, 1127–30, 1134–35) Additional argument about the police's failure to use YSTR testing to compare DNA from the fingernail with DNA from Whitely and Flis would not have changed the outcome at trial.

Consequently, Rosa did not show prejudice and the state court did not unreasonably apply *Strickland*. *Strickland*, 466 U.S. at 694. *Yarborough v. Gentry*, 540 U.S. 1, 7 (2003) ("Even if some of the arguments would unquestionably have supported the defense, it does not follow that counsel was incompetent for failing to include them. Focusing on a small number of key points may be more persuasive than a shotgun approach."); *Dell v. United States*, 710 F.3d 1267, 1282 (11th Cir. 2013) ("[I]t is quite difficult to establish that the omission of any particular argument resulted in ineffective assistance, although such a showing is possible if the argument or arguments neglected were stronger than the ones counsel actually offered."); *Dill v. Allen*, 488 F.3d 1344, 1357 (11th Cir. 2007) ("[O]ur circuit maintains that constitutionally sufficient assistance of counsel does not require presenting an alternative — not to mention unavailing or inconsistent — theory of the case.").

**Failure to Object Claim**

An analyst testified that YSTR DNA testing of the victim's fingernails could not exclude either Rosa or his male relatives as contributors. (Doc. 1 at 13) Rosa asserts that trial counsel was ineffective for not objecting to the admission of these results because no state court had ruled that YSTR DNA testing was scientifically reliable. (Doc. 1 at 13)

The Respondent asserts that this claim is unexhausted and procedurally barred. (Doc. 13 at 34–35) Rosa did not raise the claim in his post-conviction motion (Doc. 15, Ex. 9) but raised the claim in his brief on appeal. (Doc. 15, Ex. 14) Because the State of Florida did not assert on appeal that the issue was unpreserved and instead addressed the merits (Doc. 15, Ex. 15 at 19–22), Rosa is entitled to review of the claim on the merits on federal habeas. *Bennett v. Fortner*, 863 F.2d 804, 807 (11th Cir. 1989) ("The state's attorney may have briefed only the procedural default issue; he may have briefed only the merits; or he may have briefed both issues. . . . [O]nly when the state's attorney briefs the merits alone should the federal court also reach the merits.") (citing *Martinez v. Harris*, 675 F.2d 51, 54 (2d Cir. 1982)). The state appellate court's unexplained decision is an adjudication on the merits and Rosa must show no reasonable basis for the denial of the claim. *Richter*, 562 U.S. at 98.

A forensic analyst testified that she supervised YSTR DNA testing at a laboratory accredited by several national organizations. (Doc. 15, Ex. 1, Trial Transcript at 805–06) She was a member of a national YSTR DNA database consortium that had the goal to develop a larger global database. (*Id.* at 806–07) She also published articles in a scientific journal and presented material about DNA testing at national and international symposia.

(*Id.* at 807) Trial counsel neither asked the analyst about the reliability of YSTR DNA testing nor objected to her qualifications as an expert. (*Id.* at 807)

Even though a Florida appellate court has not concluded that YSTR DNA testing is scientifically reliable,[3] *Lemour v. State*, 802 So. 2d 402, 406 (Fla. 3d DCA 2001), holds that STR testing is scientifically reliable, and the analyst testified that YSTR testing is based on the same science as STR testing. (Doc. 15, Ex. 1, Trial Transcript at 815) Also, *Hodges v. State*, 55 So. 3d 515, 541–42 (Fla. 2010), relies on the results from YSTR DNA testing to conclude that the prosecution presented competent, substantial evidence to prove a crime. Before Rosa's trial, other jurisdictions had concluded that YSTR DNA testing is scientifically reliable. *Curtis v. State*, 205 S.W.3d 656, 661 (Tex. App. 2006); *Shabazz v. State*, 592 S.E.2d 876, 879 (Ga. App. 2004). Because an objection would not have succeeded, trial counsel was not ineffective. *Meders*, 911 F.3d at 1354 ("It is not ineffective assistance of counsel to fail to make an objection that is not due to be sustained.").

Even if trial counsel deficiently performed by not objecting, Rosa cannot show prejudice. During closing argument, trial counsel explained why the results based on YSTR DNA testing were scientifically unreliable (Doc. 15, Ex. 1, Trial Transcript at 1109–14):

> [Trial counsel:]   And, ladies and gentleman, ask yourself if Stephen Tomlinson was struggling and fighting for his life? And we're not talking about being shot in the head or stabbed in the heart or beat over the back of the head with a bat. We know it was a dynamic

---

[3] At the time of Rosa's trial, a Florida court applied the test under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) for expert testimony. *DeLisle v. Crane Co.*, 258 So. 3d 1219, 1227 (Fla. 2018) ("Following our repeated affirmations of the *Frye* rule, in 2013 the Legislature amended section 90.702 to incorporate *Daubert* in the Florida Rules of Evidence."). Under *Frye*, a proponent of the expert testimony must prove general acceptance of both the underlying scientific principle and the testing procedure used to apply the principle to the facts of the case. *Yisrael v. State*, 827 So. 2d 1113, 1114 (Fla. 4th DCA 2002).

situation as set forth by numerous different people.

Why was there no DNA on Stephen Tomlinson's hands and fingers. Now, I stepped away a little bit from the clippings, but now I'm talking about his hands and fingers. The one and most probable source of everything that he could do to stay alive rests in his hands and arms.

Now, I don't want to limit the possibility of his feet and legs, but certainly that is the most common means of defending yourself, especially in a situation like this. Whether it be from behind, whether it be from — from, you know, from here, whether it be in any situation, why is there no DNA on his hands and fingers?

DNA is some spectacular stuff. I don't think we can rise and fall with it as I believe I'm proving to you and will continue to show you based on the evidence. But the bottom line is it's some powerful stuff. Why wouldn't Josh Rosa's DNA be on the victim's primary means to defend himself or to create any viewable, credible injuries on Joshua Rosa?

Again, he wasn't knocked unconscious, wasn't stabbed in a vital organ. He wasn't shot. So Cassie Johnson does her testing, and what Cassie Johnson tells us is that when you do YSTR, you're going to have 17 markers, 17 different places where they look. Okay.

And what she tells you is that she got information consistent with Stephen Tomlinson at those markers and she only got information that can exclude Joshua Rosa at three of the 17 markers. And this is DNA, people. We're not talking about

three mini vans. We're not talking about three tractor trailers.

We're talking about three areas of DNA out of 17. And I anticipate the state's going to tell you, well, if there were more, you know, if there was more DNA, there might be, you know, more places and we had limited quantities. Well, we had what we had and they tested what they had. And you know what the result was?

The result was very simply that the way this works is that you have several populations and several ethnic groups, and those ethnic groups are set forth in a database and you put that sample in and you punch a number and it's going to give you a number based on that particular ethnic group.

But what it doesn't tell you, what science doesn't tell you unless you ask is that it doesn't tell you what the ethnic group is of the contributor. Okay. So the bottom line is you heard Cassie Johnson say that essentially all this does is not exclude Josh Rosa of being a person that could have contributed to that sample.

But what makes that even more startling as you consider it in your deliberations is look at the report. And I — you know, we talked about the report. The report is essentially that if you were the contributor to this sample under Stephen Tomlinson's fingernails and you weren't Josh Rosa, you were an African American, if you were an African American, it would be one in five.

So every one in five African Americans as it relates to that database would have similar DNA pattern and wouldn't be excluded. If you were a Caucasian and you happen to be the contributor to that

DNA sample, then it would be one in 20. And I don't know.

Not in jest, but certainly out of curiosity, I asked Ms. Johnson, you know, how many African Americans did you pass since you got out of the car? Because more than likely, she would have passed enough to where one of them could have been the contributor to this unknown sample.

And as it relates to Hispanics, it would be one in 12. So if there were 12 Hispanics sitting in this box, one of them could also have the same potential profile as the person that left that DNA under or on Stephen Tomlinson's clippings. And Cassie Johnson, I believe, showed us the very reason why we should be so concerned about scientific evidence.

Because if you know what you're doing, you can't be blinded by the light. You can't be blinded by the light and blinded by the numbers. So don't be blinded. This is not Joshua Rosa's DNA on that fingernail clipping. It's no more Joshua Rosa's DNA on that fingernail clipping than every 12th Hispanic that you will pass when you leave this courtroom.

Cassie Johnson used the word Joshua Rosa can't be excluded so many times that I stopped writing it down on my paper. I just stopped. I said how many times can you say somebody can't be excluded. But you know what? This is not C.S.I. This is not Law and Order and it's everyday interaction between people that know each other.

And do you know what can't exclude — can't be excluded is? That's reasonable doubt. That's what he can't be excluded means. I couldn't have put it, as it relates to that evidence, any better. If you can't be

> excluded, then you have reasonable doubt. Paulina Berdos — and I just harken back to her for a minute — said DNA gives value and weight to evidence. And you need to look closely at what this DNA evidence really gives you in terms of value and in terms of weight.

The analyst's highly speculative testimony did not directly inculpate Rosa, and trial counsel relied on that speculative testimony to argue reasonable doubt. Other more compelling evidence including blood on Rosa's hands, shoe, pant leg, and white gloves, Tomlinson's DNA in that blood, and fresh scratches on Rosa's armpit, forearm, and bicep proved Rosa's guilt. Even if an objection to the analyst's testimony would have succeeded, the outcome at trial would not have changed and the state court did not unreasonably deny the claim. Ground Four is denied. *Strickland*, 466 U.S. at 694.

Accordingly, it is **ORDERED** that Rosa's petition (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Rosa and **CLOSE** this case.

**CERTIFICATE OF APPEALABILITY
AND
LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Rosa does not make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For a claim denied on procedural grounds, Rosa does not show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues. *Slack v. McDaniel*, 529 U.S. 473, 478 (2000). Consequently, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. Rosa must obtain permission from the court of appeals to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida on February 8, 2021.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE